Ben Alke
John G. Crist
Haley Ford
CRIST, KROGH, ALKE & NORD, PLLC
209 S. Willson Ave.
Bozeman, MT 59715
Tel: (406) 255-0400
balke@cristlaw.com
jcrist@cristlaw.com
hford@cristlaw.com

Devlan Geddes
Henry J. Tesar
GOETZ, GEDDES & GARDNER, P.C.
35 N. Grand
Bozeman, MT 59715
Tel: (406) 587-0618
devlan@goetzlawfirm.com
htesar@goetzlawfirm.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| LAWRENCE ANDERSON, as trustee for the LAWRENCE T. ANDERSON AND SUZANNE M. ANDERSON JOINT REVOCABLE LIVING TRUST, ROBERT AND NORA ERHART, and TJARDA CLAGETT<br><br>               Plaintiffs,<br>    v.<br><br>BOYNE USA, INC., BOYNE PROPERTIES, INC., and SUMMIT HOTEL, LLC,<br><br>               Defendants. | Case No._____<br><br><br>**COMPLAINT AND JURY DEMAND**<br><br><br><br>***PUTATIVE CLASS ACTION*** |

For their Complaint against Defendants Boyne USA, Inc., Boyne Properties, Inc., and Summit Hotel, LLC, Plaintiffs allege as follows:

## NATURE OF ACTION

1.      This action arises from three condominium hotels at Big Sky Resort known as the Summit, Shoshone, and Village Center (collectively the "Condo-Hotels"). Boyne developed the Condo-Hotels. A major feature of the Condo-Hotels is a rental management program operated by Boyne.

2.      Boyne drafted the declarations for each Condo-Hotel. The declarations cannot be amended without the consent of Boyne. The declarations require unit owners to use Boyne as rental manager, and prohibit any unit owner from using any other person or entity as a rental manager. Boyne requires unit owners to sign a rental management agreement to participate in the rental management program. The terms of the rental management agreement are non-negotiable and can be unilaterally changed by Boyne.

3.      Boyne has exclusive control over the rental of units in the rental management program. Boyne uses that control to improperly siphon revenue that should be shared with unit owners. Boyne conceals its conduct from unit owners, failing to disclose room rates and amounts that

2

Boyne pays to itself out of revenue generated by the rental management program in the statements Boyne provides to owners.

4.      At the same time, Boyne also uses the control it granted to itself through the declarations and rental management agreement to impose costs on unit owners, including costs of insurance, maintenance, upkeep and repair, and remodeling.

5.      The arrangement created by Boyne is illegal and has damaged Plaintiffs and class members as set forth herein.

**PARTIES**

6.      Plaintiff Larry Anderson, as trustee for the Lawrence T. Anderson and Suzanne M. Anderson Joint Revocable Living Trust ("Anderson") is an individual who primarily resides in Florida and the trust is a Florida trust. Anderson owns a residential unit in the Shoshone Condominium Hotel ("Shoshone").

7.      Plaintiffs Robert and Nora Erhart are individuals who primarily reside in Florida. The Erharts own residential units in the Summit Condominium Hotel ("Summit").

8.      Tjarda Clagett is an individual who primarily resides in Maryland. Clagett owns a residential unit in the Lone Peak Center Condominium (known as the "Village Center").

3

9.     Defendant Boyne USA, Inc. is a Michigan corporation that does business in Montana.

10.     Defendant Boyne Properties, Inc. is a Michigan corporation that does business in Montana and, upon information and belief, is a wholly owned subsidiary of Boyne USA, Inc.

11.     Summit Hotel, LLC, is a wholly owned subsidiary of Boyne USA, Inc. which was incorporated in Montana.

12.     Boyne USA, Inc., Boyne Properties, Inc. and Summit Hotel, LLC are collectively referred to herein as Boyne.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 (subject matter jurisdiction) and pursuant to the Class Action Fairness Act of 2005, codified at 28 U.S.C. § 1332(d), because the class has more than one hundred (100) members, the amount in controversy exceeds $5 million, exclusive of interest and costs, and some members of the class are citizens of states different than Defendant.

14.     The Court has personal jurisdiction over Defendant because it transacts sufficient business in this district to subject it to the jurisdiction of this Court.

15.    Venue is proper in this district under 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction in this district, and therefore, resides in this district for the purposes of 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims in this case occurred in this district.

## GENERAL ALLEGATIONS

**I.    Boyne developed the Condo-Hotels.**

16.    Boyne owns and operates a ski resort known as Big Sky Resort in Madison County, Montana.

17.    Boyne owns a hotel at the base of Big Sky Resort known as the Huntley Lodge.

18.    Boyne developed the Condo-Hotels at the base of Big Sky resort.

19.    The Summit is located at the base of Big Sky Resort. It consists of 106 separate residential units and seven commercial units.

20.    The Shoshone is located at the base of Big Sky Resort. It consists of 94 separate residential units and three commercial units.

21.    The Shoshone is connected to the Huntley Lodge.

22.    The Village Center is located at the base of Big Sky Resort. It consists of 59 residential units and seven commercial units.

23.    The majority of residential units in the Condo-Hotels are owned by private individuals or entities.

24.    Boyne owns some residential units in the Condo-Hotels.

25.    Boyne owns all the commercial units in Condo-Hotels.

26.    Boyne chose to develop the Condo-Hotels as condominium-hotels, rather than hotels wholly owned by Boyne (like the Huntley), to obtain certain financial benefits.

27.    Developing a property as a condominium hotel allows a developer to sell units prior to completion.

28.    The sale of units prior to completion enabled Boyne to earn substantial profit during construction of the Condo-Hotels.

29.    It also enabled Boyne to obtain favorable financing terms to construct the Condo-Hotels.

30.    The development of a condominium-hotel, standing alone, is not improper.

31.    However, dating back to 1973, the Securities and Exchange Commission has alerted developers of condominium-hotels to the "applicability of the federal securities laws to the offer and sale of condominium units, or other units in a real estate development, coupled with an offer or agreement to perform or arrange certain rental or other

6

services for the purchaser." Condominium Release 33-5347 (January 4, 1973).  "The Commission noted that such offerings may involve the offering of a security in the form of an investment contract" and that in such event "any such securities must comply with the registration and prospectus delivery requirement of the Securities Act" and persons selling those securities would be required to register as brokers or dealers with the Commission.

32.    As an example, "the condominium units may be offered with a contract or agreement that places restrictions, such as required use of an exclusive rental agent or limitations on the period of time the owner may occupy the unit, on the purchaser's occupancy or rental of the property purchased. Such restrictions suggest that the purchaser is in fact investing in a business enterprise, the return from which will be substantially dependent on the success of the managerial efforts of other persons. In such cases, registration of the resulting investment contract would be required." *Id*.

33.    The contractual arrangement created by Boyne, which includes an exclusive rental management arrangement as described below, constitutes an investment contract.

34.    Moreover, Boyne has used its position as the developer of the Condo-Hotels to grant itself an improper degree of control of the Condo-Hotels. Boyne used that control to improperly extract profits that justifiably belong to Plaintiffs and class members while simultaneously imposing unreasonable costs on Plaintiffs and class members.

**II.    Boyne requires owners of units in the Condo-Hotels to use Boyne as rental manager and charges an excessively high rate for its services.**

35.    Boyne promoted and marketed units in the Condo-Hotels as investments to prospective purchasers.

36.    Boyne made representations to purchasers in those units regarding the economic benefits of unit ownership.

37.    Boyne prepared and drafted the declarations for the Condo-Hotels.

38.    The declarations all require unit owners to use Boyne (or a leasing agent designated by Boyne) as the rental manager, and prohibit unit owners from using any other person or entity as the rental manager.

39.    For example, the declarations of the Summit state that a "Unit Owner may not lease his Unit as a transient hotel type accommodation unless the Unit is leased only through Boyne, or a leasing agent designed by Boyne, pursuant to Boyne's or such leasing agent's standard property

8

management agreement, and upon such terms and conditions as Boyne or such leasing agent may require, in their sole discretion, provided that the management fee cannot exceed fifty percent (50%) of the gross rental income of each Unit and that said terms and conditions shall be substantially the same as for other similarly managed Units." Exhibit A, p. 19.

40.    The declarations cannot be amended without Boyne's consent.

41.    To lease a unit, Boyne requires that each unit owner employ Boyne as their agent pursuant to the terms of a rental management agreement.

42.    The rental management agreement was prepared and drafted by Boyne.

43.    The terms of the rental management agreement are non-negotiable.

44.    Initially, the rental management agreement provided that "Owner agrees to pay Agent's management fee equal to fifty percent (50%) of the gross rental revenues attributable to the rental unit." Exhibit B, p. 1.

45.    Around 2006, Boyne unilaterally changed the terms of the rental management agreement.

9

46.    The rental management agreement now provides that "in consideration for Agent's rental management services on behalf of Owner, Owner agrees to pay to Agent a management fee equal to 50% of rental revenue after the payment of costs such as hotel or resort taxes, resort fees, credit card processing fees, wholesalers and travel agent Commissions." Exhibit C, p. 4.

47.    The terms of the current rental management agreement are inconsistent with the terms of the declarations.

48.    Boyne's amendment of the rental management agreement effectively changed unit owner's share from 50% of the gross rental revenues to 50% of the net rental revenues.

49.    By comparison, other rental management companies in the Big Sky area provide similar services for 25% to 30% of the gross rental revenues.

50.    Similarly, rates charged for rental management services at resorts similar to Big Sky – which do not require owners to use the developer as rental manager – charge less than 50%.

**III.    Boyne manipulates the rental management program for its benefit and at the expense of unit owners.**

51.    Guests at the Condo-Hotels and Huntley use a Central Reservations System created and operated by Boyne.

10

52.    Boyne has the ability to book units in the Huntley (and units owned by Boyne in the Condo-Hotels) before booking guests in other units.

53.    Boyne also controls the rental rate for units listed in the Central Reservations System.

54.    All rooms are advertised and booked based on a Base Lodging Rate.

55.    Guests do not pay a separate fee for breakfast, which is included in the Base Lodging Rate advertised to guests.

56.    Guests do pay additional fees for estimated taxes and resort fees.

57.    The resort fee is not a tax. It is a fee charged by Boyne.

58.    Payments made by guests for the resort fee are deposited in Boyne's general fund.

59.    The resort fee is part of the gross rental revenue of the rental unit.

60.    Initially, Boyne did not charge a resort fee to guests who booked rooms in Huntley or Condo-Hotels.

61.    Beginning around 2000, Boyne began charging a resort fee on all bookings made through the Central Reservations System.

62.    Upon information and belief, the initial resort fee was 3%.

11

63.    The resort fee has gradually increased over time and is now 10%.

64.    Boyne has complete control over the amount it charges for the resort fee.

65.    Upon information and belief, total amount earned by Boyne from the resort fee is well in excess of a million dollars each year.

66.    Boyne does not share any portion of the resort fee with unit owners.

67.    Boyne pays itself a breakfast fee for each person who stays in a unit out of the Base Lodging Rate.

68.    The breakfast fee is currently $27 per person and $14 per child under the age of six, per night.

69.    For example, if four individuals over the age of six stay in a room, Boyne pays itself a breakfast fee of $108 per night ($27 x 4).

70.    Boyne pays itself a breakfast fee regardless of whether guests eat breakfast.

71.    Upon information and belief, the amount charged by Boyne for breakfast is well in excess of one million dollars each year.

72.    Boyne has complete control over the amount it pays itself for breakfast.

12

73.    Boyne's use of the resort fee and breakfast fee are part of a scheme to artificially lower the "rental rate" in order to increase Boyne's profits at the expense of unit owners.

74.    Boyne also requires guests who book rooms in the Condo-Hotels pay certain amounts in advance.

75.    Unit owners cannot use their rooms if they have been booked by a guest through Boyne.

76.    If a guest cancels their reservation, a certain amount of the guest deposit is forfeited.

77.    Forfeited deposits are part of the gross rental revenue.

78.    Boyne does not share any portion of the forfeited deposits with unit owners.

79.    The rental management agreement also requires unit owners to make their units available up to five nights each year for complementary use ("comp nights").

80.    Boyne obtains a benefit by providing comp nights to guests and its business partners.

81.    Boyne's manipulation of the rental program results in unit owners receiving far less than 50% of the gross rental revenue generated by their units.

## IV. Boyne conceals its conduct from unit owners.

82.    Boyne provides monthly statements to unit owners. Exhibit D.

83.    The monthly statements do not disclose the gross rental rate, base lodging rate, resort fees, taxes, forfeited deposits, breakfast fees, credit card processing fees, or wholesaler/travel agent commissions associated with units owned by Plaintiffs or class members.

84.    Plaintiffs and class members cannot determine the rate at which Boyne rents their unit from the monthly statements.

85.    Plaintiffs and class members cannot determine whether Boyne has withheld any amounts for taxes from the monthly statements.

86.    Plaintiffs and class members cannot determine whether Boyne paid itself any resort fee from the monthly statements.

87.    Plaintiffs and class members cannot determine whether Boyne paid itself any breakfast fee from the monthly statements.

88.    Plaintiffs and class members cannot determine whether Boyne retained any forfeited deposits from the monthly statements.

89.    Plaintiffs and class members cannot determine whether any amounts have been withheld by Boyne related to any credit card processing fees from the monthly statements.

90.    Plaintiffs and class members cannot determine whether any amounts have been withheld by Boyne related to wholesaler or travel agent commissions.

**V.    At the same time that Boyne charges an improperly high rate for rental management services and misappropriates unit owner funds, Boyne imposes unreasonable costs on unit owners.**

91.    Boyne also uses the declarations and rental management agreement to impose unreasonable costs on unit owners.

92.    The rental management agreement requires unit owners to pay the costs of insurance, maintenance, and repair to units.

93.    For example, the bylaws provide that so long as Boyne owns two or more units in the Summit, Boyne has the right to appoint three of the five board members, even though there are 113 units in the Summit, the vast majority of which are owned by individuals and entities other than Boyne.

94.    In 2018 and 2019, Boyne imposed special assessments on owners of residential units in the Summit. The special assessments imposed charges of approximately $8.8 million dollars on owners of units on floors 3 through 9 of the Summit.

95.    Boyne drafted the declarations so that the parking garage at the Summit constitutes 22.63% of the entire ownership interest in the Summit.

Boyne retained ownership of the parking garage and commercial units on the first and second floor (which constitute around 9% of the entire ownership), so that Boyne owns more than 25% of the Summit.

96.    Thus, Boyne imposed a special assessment on unit owners in the amount of $8.8 million while avoiding any similar assessments on units owned by Boyne.

97.    Boyne also charges owners in the Summit a fee for using the parking garage.

98.    Upon information and belief, by siphoning revenue from the rental management program and imposing unreasonable costs on unit owners, Boyne has earned significantly more profits from the Condo-Hotels than from the Huntley Lodge, separate and apart from any profits realized by Boyne from selling units in the Condo-Hotels.

**COUNT I – BREACH OF FIDUCIARY DUTY**

99.    Plaintiffs incorporate by reference the allegations above in Paragraphs 1-98.

100.  Boyne stood in a fiduciary capacity to Plaintiffs and class members.

101.  The contractual arrangement created by Boyne, where it sells units and then requires all unit owner to use Boyne for rental management

services, constitutes an investment contract pursuant to the Montana

Securities Act, the Securities Act of 1933, and the Securities Exchange Act

of 1934. Section 30-10-101, MCA *et seq.*; 15 U.S.C. § 77b(a)(1); 15 U.S.C.

§ 78c(a)(10).

102.   Boyne effectively made itself the investment manager of an

unregistered security that it created, which was sold to Plaintiffs and class

members.

103.   As rental manager, Boyne acts an agent on behalf of Plaintiffs

and class members.

104.   Boyne owes Plaintiffs and class members fiduciary duties,

including the duty of highest good faith and loyalty, to discharge duties with

the care an ordinarily prudent person in a similar situation would exercise

under similar circumstances and in a manner reasonably believed to be in

the best interests of Plaintiffs and class members, and to refrain from acting

out of avarice, expediency or self-interest in derogation of their duty of

loyalty.

105.   Boyne has repeatedly breached those duties to Plaintiffs and

class members as set forth above.

106.  In addition, Boyne had conflicts of interest in that it stood to profit from transactions at the expense of Plaintiffs and class members, to whom it owed the highest fiduciary duties.

107.  Boyne has failed to disclose its conflicts of interests to Plaintiffs and class members.

108.  Boyne has failed to disclose its profits from use of property owned by Plaintiffs and class members.

109.  Plaintiffs and class members suffered damages as a result of Boyne's breaches.

## COUNT II – CONSTRUCTIVE FRAUD

110.  Plaintiffs incorporate by reference the allegations above in Paragraphs 1-109.

111.  Boyne, acting as a fiduciary and agent for unit owners, made representations to unit owners regarding the amount of profits they would earn as owners, as well as the amount the payments Plaintiffs and class members were entitled to receive through participation in the rental management program.

112.  Those representations were untrue.

113.  Boyne made those representations without any reasonable ground for believing them to be true.

114.  Plaintiffs and class members were unaware of the falsity of the statements.

115.  Boyne gained an advantage over Plaintiffs by misleading Plaintiffs.

116.  Plaintiffs and class members have suffered damages as a result of Boyne's conduct.

117.  Boyne's conduct towards Plaintiffs and the class members constitutes fraud and/or malice as defined by Montana law for the purposes of imposing punitive damages.

## COUNT III – BREACH OF CONTRACT

118.  Plaintiffs incorporate by reference the allegations above in Paragraphs 1-117.

119.  Plaintiffs and class members on the one hand and Boyne on the other were parties to contracts (the declarations and rental management agreement).

120.  Boyne breached its agreements with Plaintiffs and class members by charging more than the rate provided for in the declarations of the Condo-Hotels.

121.  Plaintiffs and class members have been injured as a proximate result of Boyne's breach of contract as set forth above. They are entitled to recover damages for Boyne's breaches along with interest.

## COUNT IV – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

122.  Plaintiffs incorporate by reference the allegations above in Paragraphs 1-121.

123.  Every contract contains an implied covenant of good faith and fair dealing. The covenant arises not from the contract itself, but from the parties justifiable expectations regarding its performance.  It requires honesty in fact and the observance of reasonable commercial standard of fair dealing in trade.

124.  By and through the actions and decisions described above, Boyne acted with dishonesty and/or departed from reasonable standards of fair dealing, depriving Plaintiffs and class members of the benefits of their agreements with Boyne.

125.  As a result of Boyne's breach, Plaintiffs and class members have suffered damages.

## COUNT V - UNJUST ENRICHMENT/CONSTRUCTIVE TRUST

126.  Plaintiffs incorporate by reference the allegations above in Paragraphs 1-125.

127.  Boyne has received a substantial benefit from requiring unit owners to use the rental management program.

128.  In exchange, unit owners were entitled to a reasonable fee in exchange of Boyne's use of their property.

129.  Boyne has enjoyed unwarranted benefits from use of units owned by Plaintiffs and class members.

130.  Plaintiffs and class members are entitled to disgorgement damages in an amount equal to all profits earned by Boyne through the rental management program.

## COUNT VI – UNFAIR TRADE PRACTICES/ANTITRUST

131.  Plaintiffs incorporate by reference the allegations above in Paragraphs 1-130.

132.  Boyne illegally and unfairly "tied" its rental management services to ownership of units in the Condo-Hotels through the declarations.

133.  A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchase a different product.

134.   By tying rental management services to property ownership in the Condo-Hotels, Boyne is able to improperly charge above market rates for its rental management services.

135.   The mandatory rental management program also enables Boyne to avoid competition and control pricing at the base of Big Sky Resort.

136.   The sale of condominium units, coupled with a mandatory rental management program, represents an illegal tying arrangement pursuant to Federal Law. 15 U.S.C. §§ 1, 2, 14.

137.   The arrangement created by Boyne represents an unlawful restraint of trade under Montana law. *See* § 30-14-205, MCA.

138.   Plaintiffs and class members have been damaged by this illegal tying arrangement, including, amounts improperly paid to Boyne for rental management services in excess of the fair market rate.

139.   Plaintiffs and class members are also entitled to statutory penalties and treble damages, as allowed State and Federal law.

**COUNT VII - ACCOUNTING**

140.   Plaintiffs incorporate by reference the allegations above in Paragraphs 1-139.

141.  The rental management agreement requires Boyne to keep full accounting records of all transactions of units of owners.

142.  Boyne exercises exclusive control over much of the information and documents necessary for Plaintiffs and class members to ascertain the full extent of their claims, damages, and appropriate remedies.

143.  The payments and transactions that must be evaluated are complicated in nature and scope.

144.  Plaintiffs and class members need discovery to ascertain the full extent of their damages.

145.  Plaintiffs and class members are entitled to a full accounting of all transactions in the Condo-Hotels for each unit.

146.  Such accounting may demonstrate Plaintiffs and class members are entitled to further relief and accordingly they reserve the right to assert additional claims in a future pleading.

## COUNT VIII - DECLARATORY JUDGMENT

147.  Plaintiffs incorporate by reference the allegations above in Paragraphs 1-146.

148.  A dispute exists between Plaintiffs and class members on the one hand and Boyne on the other hand concerning their respective rights

and obligations under the Rental Management Agreement and the declarations.

149.  A justiciable controversy exists as contemplated by § 27-8-101, MCA, *et seq* and its federal counterpart.

150.  Pursuant thereto, Plaintiffs and class members seek declaratory relief and ask this Court to enter judgment determining and enforcing their rights as appropriate under the rental management agreement and the declarations, including but not limited to declarations that:

>   a.  The requirement that unit owners use Boyne as the rental manager is illegal and unenforceable.

>   b.  The declarations are illegal and unenforceable to the extent they give Boyne control over rental management and the homeowners associations of the Condo-Hotels.

## CLASS ALLEGATIONS

151.  Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiff seeks certification of a class under Rule 23(b)(1), (b)(2), and (b)(3).

152.  Class Definition. The class is composed of all current or former owners of the Condo-Hotels (other than Boyne) and were required to hire Boyne as an agent as a condition of leasing their property.

153.  Numerosity. The class is comprised of hundreds of persons and is so numerous that joinder of all members is impracticable.

154.  Commonality.   There are questions of law or fact common to the class.  The claims or defenses of Plaintiffs as the representative parties are typical of the claims or defenses of the class. Further, the questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

155.  Typicality and Adequacy.  Plaintiffs are adequate representatives of the class because their interests do not conflict with the interests of the class members they seek to represent, and they are similarly situated with members of the class.  Plaintiffs, as the representative parties for the class, will fairly and adequately represent and protect the interests of the class. Furthermore, Plaintiffs' interests are not antagonistic to the class. Plaintiffs have retained counsel who is competent and experienced in the prosecution of class action litigation.

156.  Predominance. Common questions of fact or law predominate over individualized issues. The facts surrounding Boyne's practices will

25

clearly predominate over any individualized issues because this case centers on Boyne's rental management program. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. The interest of members of the class in individually controlling the prosecution or defense of separate actions is not great given the amount in controversy and the difficulty of detection of the enterprise and proof of it; there is no other known litigation concerning the controversy already commenced by or against members of the class; it is desirable to concentrate this litigation in one forum and there are no known difficulties likely to be encountered in the management of a class action.

**JURY DEMAND**

Plaintiffs request a jury trial on any issue to which there is a right to trial by jury.

**REQUEST FOR RELIEF**

Plaintiffs respectfully request that:

1.    The Court certify the class described above.

2.    Plaintiffs request that the Court award them and the class actual damages, interest as allowed by law, attorneys' fees and costs, and all other relief to which the and the class are entitled at law or in equity.

3.    Plaintiffs request general relief.

DATED this 30th day of December 2021.

CRIST, KROGH, ALKE & NORD, PLLC


By:   /s/ Ben Alke
         Ben Alke