## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| LAWRENCE ANDERSON, as trustee for the LAWRENCE T. ANDERSON AND SUZANNE M. ANDERSON JOINT REVOCABLE LIVING TRUST; ROBERT AND NORA ERHART; and TJARDA CLAGETT,<br><br>Plaintiffs,<br><br>v.<br><br>BOYNE USA, INC.; BOYNE PROPERTIES, INC.; and SUMMIT HOTEL, LLC,<br><br>Defendants. | **No. CV 21-95-BU-BMM**<br><br><br>**ORDER ON MOTION FOR INJUNCTIVE RELIEF** |

## INTRODUCTION

Plaintiffs Larry Anderson ("Anderson"), Bob and Nora Erhart ("Erharts"), and Tjarda Clagett ("Clagett") (collectively "Plaintiffs") seek an injunction to prevent Defendants Boyne USA, Inc., Boyne Properties, Inc., and Summit Hotel, LLC (collectively "Boyne") from terminating the Rental Management Agreements ("RMAs") with the named Plaintiffs. (Doc. 173 at 2.) Boyne provided notice to Plaintiffs' counsel that Boyne intended to terminate the RMAs with the named Plaintiffs effective December 16, 2023. (Doc. 174 at 2.) The Court held a hearing on the motion on December 7, 2023. (Doc. 182.)

## FACTUAL AND LEGAL BACKGROUND

The Court assumes familiarity with the factual background provided in its previous orders. Boyne owns and operates Big Sky Resort ("Big Sky"), as well as three condominium-hotels at the base of Big Sky known as the Summit, Shoshone, and Village Center (collectively "the Condos"). (Doc. 26 at 2, 5.) Plaintiffs own units in the Condos. Unit owners may not lease their units except through Boyne. (Doc. 1-1; Doc. 1-2; Doc. 1-3.) Plaintiffs hold title to the Condos subject to certain Declarations. (Doc. 4 at 8.) Boyne drafted the Declarations and does not allow amendments without its consent. (Doc. 9 at 12.) Boyne prepared the RMA that unit owners must sign with Boyne if they are not using their unit for personal use. (*Id.* at 14.) Plaintiffs allege that their RMAs with Boyne violate state and federal law. (Doc. 4 at 6.)

Plaintiffs filed a Motion to Maintain the Status Quo on February 3, 2023, seeking to enjoin Boyne from terminating RMAs during the class certification process. (Doc. 48.) The Court granted, in part, and denied, in part, the motion on February 23, 2023. (Doc. 68; Doc. 73.) The Court's order prohibited Boyne from terminating the unit owners' RMAs for a period of 60 days. (Doc. 73.) The Court orally granted a 60-day extension of this order on April 12, 2023. (Doc. 81.) The Court failed to put this oral order in writing or include it in the minute entry. Boyne appealed the injunction. (Doc. 74.) The Ninth Circuit remanded for clarification as

to whether the order prohibiting termination of the rental agreements remained in effect. (Doc. 136.) The Court clarified that it had granted the injunction solely to protect the integrity of the class certification process and thus, that the injunction had expired. (Doc. 148.) The Ninth Circuit dismissed Boyne's appeal based on the Court's clarification that the injunction was issued to "address concerns about 'the integrity of the class certification process' and that its certification of the class in June 2023 'extinguished these concerns.'" Plaintiffs now seek another injunction to prevent Boyne from terminating the RMAs with the named Plaintiffs on December 16, 2023. (Doc. 173 at 2.)

## LEGAL STANDARD

Rule 23(d) grants courts the authority to oversee class actions. Fed. R. Civ. P. 23(d). A court "may issue orders that determine the course of proceedings . . . [or] impose conditions on the representative parties." *Id.* "Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).

District courts enjoy discretion regarding the grant or denial of a preliminary injunction. *Envtl. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). A plaintiff seeking a preliminary injunction must establish the following four factors: (1) that they are likely to succeed on the merits, (2) that they are likely to suffer

irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

## DISCUSSION

Plaintiffs argue that Fed. R. Civ. P. 23(d) and the Court's inherent power to manage its cases provide the Court with authority to issue the requested injunction. (Doc. 174 at 5–6.) Plaintiffs contend that Boyne's tactics constitute a form of retaliation meant to influence inappropriately class members to opt out of the class action. (*Id.* at 10–11.) Boyne responds that it has sought to terminate the RMAs of only the named Plaintiffs, not all class members. Boyne contends that its actions prove non-coercive as to the whole class because its actions relate only to the named Plaintiffs and no evidence exists that any other class members would learn of the termination of the named Plaintiffs' RMAs.

## I. Whether the Court can issue an order pursuant to Fed. R. Civ. P. 23(d) enjoining Boyne from terminating the named Plaintiffs' RMAs.

District courts possess broad authority to exercise control over class actions and enter appropriate orders governing the conduct of parties to the action. *McKee v. Audible, Inc.*, No. CV 17-1941-GW(Ex), 2018 U.S. Dist. LEXIS 179978, at 9–10 (C.D. Cal. April 6, 2018) (citing *Gulf Oil Co.*, 452 U.S. at 100). "'The prophylactic power accorded to the court presiding over a putative class action under Rule 23(d) is broad.'" *McKee*, 2018 U.S. Dist. LEXIS 179978, at *10 (quoting *O'Conner v.*

*Uber Techs., Inc.*, No. C-13-3826 EMC, 2014 U.S. Dist. LEXIS 61066, at *3 (N.D. Cal. May 1, 2014) ("*O'Conner II*")). The Court must "exercise this authority in order to prevent abuse of the class action mechanism and prohibit parties from acting in a manner that could undermine the fairness of the proceeding." *Laguna v. Coverall N. Am., Inc.*, No. 09-CV-2131-JM (BGS), 2010 U.S. Dist. LEXIS 150105, at *14 (S.D. Cal. Nov. 30, 2010) (citing *Gulf Oil Co.*, 452 U.S. at 99–100; *Wang v. Chinese Daily News*, 623 F.3d 743, 756 (9th Cir. 2010)). Any orders issued under Fed. R. Civ. P. 23(d) must "be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co.*, 452 U.S. at 101.

Courts look to the potentially coercive nature of the conduct toward class members and evaluate whether the conduct "is so misleading or coercive that it threatens the fair and efficient administration of [a] class action lawsuit." *O'Conner II*, 2014 U.S. Dist. LEXIS 61066, at *16. For example, the defendant in *Lake v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893 (N.D. Ill. 2013), sent releases and a settlement offer to consumers of the product for which they were sued. The district court noted that "[n]one of the class members are dependent on Unilever for their financial livelihood . . . and thus it cannot be said that the business relationship between Unilever and the potential class members is inherently coercive." *Id.* at 928. The district court found no evidence of coercion and denied the request to limit

Unilever's communications with potential class members or vacate the releases obtained by Unilever. *Id.* at 929–30.

The district court found evidence of coercive conduct against class members in *O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2013 U.S. Dist. LEXIS 172477, at \*17–23 (N.D. Cal. Dec. 6, 2013) ("*O'Conner I*"). Uber restructured its licensing agreement to include an arbitration provision after Uber had been sued by drivers in a class action. *Id.* at \*3–4. Continued access to the Uber app and thus, the ability to continue driving for Uber depended on a drivers' acceptance of the new terms of service. *Id.* at \*3. The district court noted that "[t]he arbitration provision at issue includes a class action waiver, purporting to contractually bar Uber drivers from participating and benefitting from any class actions." *Id.* at \*18. The district court recognized the potential coercive effect of Uber's tactics: "the promulgation of the Licensing Agreement and its arbitration provision, runs a substantial risk of interfering with the rights of Uber drivers under Rule 23." *Id.* at \*21. The district court refused to enforce the arbitration provision unless Uber gave drivers "clear notice of the arbitration provision, the effect of assenting to arbitration on their participation in [the] lawsuit, and reasonable means of opting out of the arbitration provision." *O'Connor I*, 2013 U.S. Dist. LEXIS 172477, at \*22–23.

The Ninth Circuit in *Wang* upheld a district court's decision to invalidate opt outs obtained from potential class members. 623 F.3d at 757, *judgment vacated on*

*other grounds*, 565 U.S. 801 (2011). A class of employees had sued their employer for violations of the Fair Labor Standards Act. *Wang*, 623 F.3d at 749. The employer terminated several of the named class members and terminated the lead class representative during the opt-out period. *Id.* at 756. The Ninth Circuit agreed with the district court's determination that "'the opt out period was rife with instances of coercive conduct, including threats to employees' jobs, termination of an employee supporting the litigation, the posting of signs urging individuals not to tear the company apart, and the abnormally high rate of opt outs.'" *Id.* at 757 (quoting *Wang v. Chinese Daily News, Inc.*, 236 F.R.D. 485, 491 (C.D. Cal. 2006)).

A district court similarly recognized the coercive pressure that termination of a franchise agreement could have on a class action. *In re International House of Pancakes Franchise Litigation*, No. 77, 1972 U.S. Dist. LEXIS 15714 (W.D. Mo. Jan. 4, 1972) ("*In re IHOP*"). Franchise holders instituted a class action against their franchisor in *In re IHOP*. *Id.* at *2–3. The franchisor threatened to terminate franchise agreements with some of the plaintiffs after the institution of the suit. *Id.* The district court recognized that this conduct was "designed to use economic power, which the [franchisor] possesses, to drive these plaintiffs out of business as a lesson to other members of the class not to participate in the class action." *Id.* at *2. The district court enjoined the franchisor from terminating franchise agreements held by the plaintiffs for any reason besides non-payment. *Id.* at *4–5.

7

Boyne's conduct raises similar concerns to those raised in *In re IHOP* and *Wang*. Boyne has provided notice that it intends to terminate the RMAs with the named Plaintiffs. (Doc. 174-1 at 1.) Importantly, the declarations for the unit owners' condominiums prohibit the unit owners from leasing their units through anyone other than Boyne. (Doc. 180 at 2.) Accordingly, by terminating the named Plaintiffs' RMAs, Boyne effectively would prevent the named Plaintiffs from being able to rent their units and earn rental income.

Boyne contends that this behavior proves non-coercive for two reasons. Boyne first argues that it has sought to terminate only the named Plaintiffs' RMAs and that none of the other class members know or would know of the terminated agreements. The Court finds this argument unavailing. Plaintiffs noted at the hearing that the community at Big Sky is small, and it proves unlikely that other class members or potential class members would not learn of the termination of the RMAs.

Boyne next argues that the named Plaintiffs "are hardly destitute or financially reliant on rental income from their vacation properties." (Doc. 179 at 17.) Boyne noted that many of the named Plaintiffs purchased their condominium units for nearly $1 million, paid in cash, and retain those units as second or third homes. Plaintiffs counter that while the named Plaintiffs may not rely on the rental income to survive, they rely on it to offset the expensive homeowners' association dues.

(Doc. 180 at 9.) Plaintiffs noted in briefing and at the hearing that the named Plaintiffs pay approximately $30,000 per unit in annual association dues in addition to special assessments, which totaled $180,000 for the Erharts' two units. (*Id.*)

The Court recognizes that Plaintiffs generally do not rely on their units as their sole source of income. Boyne's argument ignores, however, that the prominent inquiry for an order under Fed. R. Civ. P. 23(d) involves one of coerciveness. Threatened conduct may have a greater coercive effect when a plaintiff or class member proves wholly financially dependent on the defendant. *In re IHOP* and *Wang* presented such cases. Conduct still may prove coercive and abusive, however, where the plaintiff has other sources of income on which to live. A heightened concern for coercive conduct exists where, as here, the class members and class opponent remain in an ongoing business relationship. *Sorrentino v. ASN Roosevelt Ctr. LLC,* 584 F. Supp. 2d 529, 533 (E.D. N.Y. 2008) (internal citations omitted); *see also Laguna*, 2010 U.S. Dist. LEXIS 150105, at *26.

Plaintiffs rely on rental income to offset hefty homeowners' association fees. Plaintiffs will be unable to earn rental income if Boyne terminates their RMAs, as Plaintiffs cannot rent through anyone other than Boyne pursuant to their condominium declarations. An example proves illustrative of the coercive nature of Boyne's tactics. Boyne assessed Plaintiff Anderson $24,067 in rental expenses in 2021, of which $21,413 represented solely condominium association fees. (Doc.

9

179-4.) Plaintiff Anderson offset this charge by renting out his condominium and earning $21,480. (*Id.*) This offset left Plaintiff Anderson to pay only $2,587. Without the ability to rent, Plaintiff Anderson would have paid at least $21,413. Being forced to pay between twenty and thirty thousand dollars per year that one otherwise would not have to pay represents a substantial economic threat. Boyne's conduct incentivizes Plaintiffs to abandon their lawsuit to avoid termination of their RMAs.

Boyne's letter indicating their intent to terminate the RMAs directly ties the decision to terminate the RMAs to the Plaintiffs' suit against Boyne: "because Plaintiffs contend Boyne is committing ongoing torts with respect to its rental management of Plaintiffs' units, among other allegations, Boyne hereby provides notice of its intent to terminate the rental management agreement between Boyne USA, Inc. and each of the named Plaintiffs." (Doc. 174-1 at 1.) Boyne's other conduct throughout litigation, including threatening to terminate the RMAs in the class certification stage and implementing a ban on skiing or staying at Big Sky for all attorneys and staff working for Plaintiffs, supports Plaintiffs' argument that Boyne's conduct serves to intimidate others from participating in the litigation. (Doc. 174 at 10–11; Doc. 49 at 6, 17–18.)

Boyne argues that it seeks to terminate the RMAs to limit any damages for which it may be held liable. (Doc. 179 at 16.) Boyne contends that Plaintiffs have claimed that the RMAs prove illegal and that the rental management scheme exposes

Boyne to potential liability. Boyne argues that the damages for which it could be held liable will continue to accrue if forced to continue the RMAs with Plaintiffs. Plaintiffs indicated at oral argument that the named Plaintiffs would forego damages from this point forward if the RMAs stay in place.

The need for a limitation on Boyne's conduct proves clear here. Termination of the RMAs threatens to take away the income on which the named Plaintiffs rely to offset the hefty condominium association fees. The termination of the RMAs in light of the class members' ongoing business relationship with Boyne presents substantial concern for an improperly coercive impact on class members' choice to participate in the litigation. The potential interference with Boyne's rights proves minimal if damages from the continued operation of the RMAs are disallowed from this point forward. The Court finds that an order prohibiting Boyne from terminating the named Plaintiffs' RMAs proves necessary to "'protect the integrity of the class and the administration of justice.'" *O'Conner II*, 2014 U.S. Dist. LEXIS 61066, at *11 (quoting *Gulf Oil Co.*, 452 U.S. at 100). The Court further finds that disallowing damages that arise after the date of the entry of this Order adequately balances and protects Boyne's interests in limiting its damages.

## II.   Whether the Court can issue an order pursuant to the Court's inherent authority to enjoin Boyne from terminating the named Plaintiffs' RMAs.

Strong precedent exists "'establishing the inherent power of federal courts to

regulate the activities of abusive litigants by imposing carefully tailored restrictions under the appropriate circumstances.'" *De Long v. Hennessey*, 912 F.2d 1144, 1147 (9th Cir. 1990) (quoting *Tripati v. Beaman*, 878 F,2d 351, 352 (10th Cir. 1989)). The Ninth Circuit has recognized that "[c]ourts have the ability to address the full range of litigation abuses through their inherent powers." *F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001). Importantly, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). "'Injunctive relief, where warranted, can be a useful tool to aid a court in controlling the conduct of litigants.'" *Myart v. Taylor*, No. SA:16-CV-455-DAE, 2016 U.S. Dist. LEXIS 130953, at *11 (W.D. Tex. Sept. 26, 2016) (quoting *Lewis v. S.S. Baune*, 534 F.2d 1115, 1121 (5th Cir. 1976)).

Plaintiffs cite *Bergen Drug Co. v. Parke, Davis & Co.* for their argument that the Court possesses inherent authority to issue an injunction to prevent litigants from engaging in behavior that interferes with the judicial process. (Doc. 174 at 11 (citing *Bergen*, 307 F.2d 725, 726 (3rd Cir. 1962)). In *Bergen Drug Co.*, a wholesaler sued a drug company for antitrust violations. 307 F.2d at 726–27. The drug company issued a notice after the filing of the wholesaler's suit that the drug company would no longer do business with the wholesaler. *Id.* at 726. The Third Circuit determined that the drug company's products proved indispensable to the wholesaler's

operation. *Id.* at 728. The Third Circuit recognized that the drug company's refusal to sell to the wholesaler posed serious consequences for the wholesaler's ability to continue operating and also for the wholesaler's ability to obtain the cooperation of other wholesalers in their antitrust action. *Id.* The Third Circuit remanded with an order to the district court to grant the injunction noting that "a court can act where a party's conduct is calculated to frustrate litigation." *Id.*

*In re IHOP* presented another instance in which the district court exercised inherent authority to issue an injunction. The district court enjoined a franchisor from terminating franchise agreements held by the plaintiffs in a suit against the franchisor. The district court referenced Fed. R. Civ. P. 65 in outlining to whom the preliminary injunction applied. The district court determined, however, that the franchisor had engaged in conduct designed to use economic power to drive the plaintiffs out of business as a lesson to other franchise holders not to participate in the class. *In re IHOP*, 1972 U.S. Dist. LEXIS 15714, at *2. The district court noted that it "ha[d] no doubt of its jurisdiction and power to enjoin all such actions by defendant which are done for this purpose." *Id.* at *3.

Boyne argues that Fed. R. Civ. P. 65 controls the issuance of injunctions. The Court recognizes the Ninth Circuit's guidance that "it is preferable that courts utilize the range of federal rules and statutes dealing with misconduct and abuse of the judicial system." *F.J. Hanshaw Enters.*, 244 F.3d at 1136–37. The Ninth Circuit also

has recognized, however, that "courts may rely upon their inherent powers . . . even where such statutes and rules are in place." *Id.* at 1137. The Court finds that issuance of a preliminary injunction under Fed. R. Civ. P. 65 proves warranted. The Court also determines, however, that even absent this finding, the Court could issue an injunction enjoining Boyne from terminating the named Plaintiffs' RMAs pursuant to the Court's inherent powers.

Boyne has threatened to terminate the named Plaintiffs' RMAs specifically because of the named Plaintiffs' suit against Boyne. (Doc. 174-1 at 1.) Boyne threatened to do so before class certification and has renewed the threat following class certification but before the opt-out process. The Court has recognized the improper risk of coercion that such threat poses for class members deciding whether to participate in the class action. The Court possesses no doubt that its inherent authority empowers it to issue an injunction prohibiting the termination of the RMAs where, as here, Boyne's conduct "is calculated to frustrate litigation." *Bergen Drug Co.*, 307 F.2d at 728. The Court's limitation on the named Plaintiffs' ability to claim damages going forward reflects a balancing of the parties' interests consistent with the restraint and discretion required when exercising inherent powers.

### III. Whether Plaintiff meets the requirements for a preliminary injunction under Fed. R. Civ. P. 65 and *Winter*.

A plaintiff who seeks a preliminary injunction must establish the following: (1) a likelihood to succeed on the merits, (2) a likelihood of suffering irreparable

harm absent preliminary relief, (3) a balance of equities favoring the movant, and (4) that an injunction supports public interest. *Winter*, 555 U.S. at 20. A party seeking a mandatory injunction must meet a heightened standard by "establish[ing] that the law and facts clearly favor [their] position, not simply that [they are] likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). A mandatory injunction "require[s] [the non-movant] to take affirmative action." *Id.*

Boyne argues that the heightened standard for mandatory injunctive relief applies to Plaintiffs' request. (Doc. 179 at 22.) Boyne argues that the relief requested by Plaintiff constitutes a mandatory injunction because it changes the status quo. Boyne contends that it remained free to cancel RMAs with any condo owners before Plaintiffs filed this action. Boyne characterizes the relief Plaintiffs seek as requiring "Boyne be forced to continue providing Plaintiffs with rental management services against its will." (*Id.* at 21–22.) The Court disagrees.

The status quo constitutes "the last, uncontested status which preceded the pending controversy." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). Plaintiffs participated in the rental management program well before they filed suit against Boyne. An injunction to prohibit Boyne from terminating the RMAs would not result in any affirmative change. The requested injunction, instead, would allow Boyne and the named Plaintiffs to continue renting Plaintiffs' units in accordance with the RMAs as the parties have

since before the filing of Plaintiffs' suit. The requested injunction would maintain the status quo. Accordingly, the ordinary *Winter* standard proves appropriate.

### a.  Likely to suffer irreparable harm absent the requested relief.

Boyne asserts that Plaintiffs have failed to demonstrate that they are likely to suffer irreparable harm. Boyne contends that Plaintiffs primarily have shown that they will suffer monetary harm. (Doc. 179 at 23.) Plaintiffs allege that Boyne's planned termination of the RMAs "threatens to influence the litigation." (Doc. 174 at 17.) The Court agrees with Plaintiffs.

As analyzed above, Boyne's proposed conduct carries substantial potential to influence class members in participating in the litigation. Boyne seeks to terminate only the named Plaintiffs' RMAs at the moment. A great likelihood exists, however, that potential class members will weigh the cost of potentially losing their RMAs with Boyne when choosing whether to participate in the litigation. This implicit economic pressure asserted by Boyne not only proves improper, but also threatens the fairness of the litigation and potential class members' right to participate in the litigation. Such harm cannot be measured or adequately addressed after the fact.

Boyne challenges the likelihood of any harm to the litigation occurring, as Boyne does not intend to communicate the termination of the RMAs to anyone other than the named Plaintiffs. Big Sky is a relatively small community. This litigation also draws the attention of many property owners in Big Sky, as many of them

represent potential class members. These filings regarding the termination of the RMAs constitute public records. The Court finds that the likelihood of class members and potential class members learning of the termination of Plaintiffs' RMAs proves high. Plaintiffs likely would suffer irreparable harm in the absence of injunctive relief.

### b. Balance of the equities.

Plaintiffs allege that termination of the RMAs would threaten the ability of the class action to go forward by inappropriately forcing class members to choose between participating in the class or retaining the ability to earn rental income off their properties. (Doc. 174 at 18.) Boyne argues that Plaintiffs are very wealthy and do not rely on their rental income for their livelihood. Thus, Boyne argues that denying Plaintiffs' request for injunctive relief minimally would impact Plaintiffs' income while potentially exposing Boyne to increased liability and damages. (Doc. 179 at 25.) Boyne's argument ignores the named Plaintiffs' willingness to forego damages that may arise from this point from the continuation of the RMAs.

Boyne indicated at the hearing that it is not terminating its rental management program altogether. Boyne will continue renting out other owners' units pursuant to RMAs identical to those entered with Plaintiffs. Boyne indicated no hardship in renting out the named Plaintiffs' units besides the potential increase in damages that Plaintiffs could claim.

Boyne faces no prejudice by continuing the named Plaintiffs' RMAs if the Court prohibits the Plaintiffs from recovering damages that arise after the date of the entry of this Order from the continuation of the RMAs. In fact, Boyne benefits from such an injunction. Boyne can continue renting out Plaintiffs' units and earning income from those rentals without facing any related increase in the damages claimed against it. Plaintiffs, on the other hand, would suffer the loss of rental income on which the named Plaintiffs rely to offset the hefty condominium association fees if the Court denies the motion for injunctive relief. Plaintiffs also suffer great risk that class members would feel pressure not to join the class action in order to keep Boyne from terminating their RMAs. The balance of the equities tips sharply in favor of Plaintiffs.

### c. Public interest.

Boyne argues that denying injunctive relief would serve the public interest because the public has an interest in the freedom to contract and public interest disfavors specific performance of contracts. (Doc. 179 at 26.) "Class actions serve an important function in our system of civil justice." *Gulf Oil Co.*, 452 U.S. at 99. "Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress." *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980). Class actions provide a solution through which plaintiffs can bring

cases and address wrongs that otherwise might go unaddressed due to concerns regarding economic feasibility. *Id.* Rule 23 of the Federal Rules of Civil Procedure reflects a policy of "protect[ing] class members and fairly conduct[ing] the [class] action." Fed. R. Civ. P. 23(d)(1)(B).

Courts continually note the goal of safeguarding the fairness of class actions: "[c]ourts are obligated to exercise [their] authority in order to . . . prohibit parties from acting in a manner that could undermine the fairness of the proceeding," *Laguna*, 2010 U.S. Dist. LEXIS 150105, at *14; "Rule 23(d) grants a court broad authority to exercise control over a class action . . . so that it may . . . protect the integrity of the class and the administration of justice," *O'Connor II*, 2014 U.S. Dist. LEXIS 61066, at *11 (internal quotations omitted). Courts also continually note the strong policy against interference with potential class members' decisions to participate in a suit: "courts may limit communications that improperly encourage potential class members to not join the suit," *McKee*, 2018 U.S. Dist. LEXIS 179978, at *11; "[courts possess the ability] to control communications which threaten to influence the choice of remedies in class actions," *O'Connor II*, 2014 U.S. Dist. LEXIS 61066, at *14; "[the defendant's actions] use economic power . . . to drive these plaintiffs out of business as a lesson to other members of the class not to participate in the class action or . . . cooperat[e]." *In re IHOP*, 1972 U.S. Dist. LEXIS 15714, at *2.

Class actions and the integrity thereof prove important public interests. The right of potential class members to make a free and informed choice about their participation in class actions also constitutes a public interest. Enjoining Boyne's proposed conduct would prevent undue influence on potential class members in deciding whether to participate in the action and protect the integrity and fairness of the class action. The Court determines that enjoining Boyne from terminating the Plaintiffs' RMAs would serve the public interest.

### d. Likely to succeed on the merits.

*Winter* requires that Plaintiffs show a likelihood of success on the merits. The Ninth Circuit has determined that a preliminary injunction may issue only upon a showing of "serious questions going to the merits" without running afoul of *Winter*. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). For a plaintiff to satisfy this "sliding scale test" the plaintiff must show "a balance of hardships that tips sharply towards the plaintiff . . . that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. Plaintiffs have shown these three requirements, as outlined above. Thus, Plaintiffs need only show "serious questions going to the merits." *Id.*

Plaintiffs have raised claims regarding breach of fiduciary duty, constructive fraud, breach of contract, and unfair trade practices among others. (Doc. 26 at 17–22.) Plaintiffs also seek a declaration that the condominium declarations'

requirement that unit owners use Boyne as their rental manager proves illegal and unenforceable. (Doc. 26 at 23.) The Court finds that Plaintiffs have raised serious questions as to merits of several of these claims.

For example, with Plaintiffs' unfair trade practices claim, Plaintiffs allege that "Boyne illegally and unfairly 'tied' its rental management services to ownership of units in the Condo-Hotels and other condominiums through the declarations." (Doc. 26 at 22.) A tying arrangement exists where a seller exploits its control over the tying product to force the buyer into the purchase of a tied product "that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (2006). Boyne correctly notes that the Declarations do not require condominium owners to rent their properties such that owners can avoid entering RMAs by not renting their units. Boyne ignores, however, that the Declarations force unit owners who might have sought to "purchase [rental management services] elsewhere on different terms" to enter an RMA with Boyne. *Id.* The Declarations accompanying the condominiums sold by Boyne thereby "reduce[] competition in the market for the tied product," which in this case is rental management services. *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 971 (9th Cir. 2008). Plaintiffs have raised serious questions as to whether such an arrangement constitutes an illegal tying arrangement. Plaintiffs have raised serious questions as to the merits of their claim

for unfair trade practices. For similar reasons, Plaintiffs have raised serious questions as to whether Plaintiffs prove entitled to a declaration that the condominium declarations' requirement that unit owners use Boyne as their rental manager proves illegal and unenforceable.

Plaintiffs also have raised serious questions as to the merits of their breach of fiduciary duty claim. A fiduciary relationship likely exists between the parties due to the sale of the condominium likely constituting a security, as defined by the Securities and Exchange Commission:

> condominium units may be offered with a contract or agreement that places restrictions, such as required use of an exclusive rental agent . . . on the purchaser's occupancy or rental of the property purchased. Such restrictions suggest that the purchaser is in fact investing in a business enterprise, the return from which will be substantially dependent on the success of the managerial efforts of other persons. In such cases, registration of the resulting investment contract would be required.

1973 SEC LEXIS 3277 at * 5–6. Regardless, Boyne agreed to act "as [Plaintiffs'] Agent for the purpose of renting, managing, and operating the Unit[s]." (Doc. 4-7 at 1.)

An agency constitutes a fiduciary relationship that imposes certain fiduciary duties upon the agent. *Pennell v. Nationstar Mortg., LLC*, 520 P.3d 796, 799 (Mont. 2022); *Marie Deonier & Assocs. v. Paul Revere Life Ins. Co.*, 101 P.3d 742, 752 (Mont. 2004). These duties include the "duty of the agent to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his

principal." *First Nat'l Bank v. Sant*, 506 P.2d 835, 839 (Mont. 1973). Another duty requires that an agent "should not, without the knowledge of his principal, engage in transactions which tend to bring his personal interest into conflict with his obligations to his principal, nor should he place himself in a position where his interests may become antagonistic to those of his principal." *Id.*

Plaintiffs have alleged that Boyne inflated the fees associated with rental stays, including resort and breakfast fees, in order to reduce the room rate available to the unit owners. (Doc. 26 at 13.) Plaintiffs contend that Boyne inflated these fees to increase their profit margin since Boyne must split only the room rate with unit owners and does not split these other fees. (*Id.*) Plaintiffs have raised serious questions as to whether Boyne potentially placed its interests in conflict with Plaintiffs in this profit-sharing scheme. Plaintiffs also have raised serious questions as to whether Boyne complied with the duties for trust accounting placed on property managers by the Administrative Rules of Montana. The Court refers to its prior order on Plaintiffs' Motion to Compel. (Doc.183 at 7–10.) The Court finds that Plaintiffs have raised serious questions on the merits of their claim that Boyne breached its fiduciary duties.

The Court finds that serious questions have been raised as to the merits, that Plaintiffs are likely to suffer irreparable harm, that the requested injunctive relief serves the public interest, and that the balance of equities tips sharply in favor of

Plaintiffs. Accordingly, the Court will grant Plaintiffs' motion for injunctive relief.

**IV.    Whether Plaintiffs must post a security for the preliminary injunction and if so, in what amount.**

"Federal Rule of Civil Procedure 65(c) permits a court to grant preliminary injunctive relief 'only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). The district court possesses discretion in determining "'the amount of the security, *if any*.'" *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)) (emphasis in original). A court "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen*, 320 F.3d at 919 (citing *Barahona-Gomez*, 167 F.3d at 1237).

The Court determines that no realistic likelihood of harm to Boyne exists from enjoining the termination of the named Plaintiffs' RMAs. The only potential harm that Boyne would suffer from the requested injunctive relief is a potential increase in the damages faced by Boyne. In fact, Boyne experiences financial benefits in continuing the RMAs with the named Plaintiffs, as Boyne can continue renting out these units and earning profits from these rentals. The Court's order prohibiting the named Plaintiffs from recovering any potential damages from this point forward from the operation of their RMAs ensures that Boyne will not suffer any harm from

24

the requested injunctive relief. *Jorgensen*, 320 F.3d at 919. Accordingly, the Court waives the bond requirement.

## CONCLUSION

The Court has concluded that Plaintiffs' motion warrants the issuance of a preliminary injunction on three separate grounds. Boyne's proposed termination of the named Plaintiffs' RMAs first presents substantial risk of influencing class members' decisions to participate in the action and threatens to undermine the integrity of the class action proceeding. Accordingly, the Court possesses authority pursuant to Fed. R. Civ. P. 23(d) to issue an order enjoining the proposed termination of the RMAs. The Court next possesses inherent power to issue the injunction, as Boyne's conduct presents an improper and abusive litigation tactic. Finally, Plaintiffs satisfaction of all the *Winter*'s factors warrants the requested injunctive relief under Fed. R. Civ. P. 65.

The Court prohibits Boyne from terminating the named Plaintiffs' RMAs. The Court also prohibits the named Plaintiffs from recovering any potential damages arising after the date of entry of this Order from the continuation of the RMAs. The Court would look with a critical eye at further efforts of the parties to modify or alter the potential class during the pendency of this litigation.

## ORDER

Accordingly, **IT IS ORDERED:**

1. Plaintiffs' Motion for Injunctive Relief (Doc. 173) is **GRANTED**.

2. Boyne is hereby prohibited from terminating its RMAs with the named Plaintiffs.

3. The named Plaintiffs are hereby prohibited from recovering any damages that may arise from continued operation of the RMAs after the date of entry of this Order.

4. The Court waives the requirement that Plaintiffs provide a bond as security for the injunctive relief.

DATED this 13th day of December, 2023.

Brian Morris, Chief District Judge
United States District Court