## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| LAWRENCE ANDERSON, as trustee for the LAWRENCE T. ANDERSON AND SUZANNE M. ANDERSON JOINT REVOCABLE LIVING TRUST; ROBERT AND NORA ERHART; and TJARDA CLAGETT, <br><br> Plaintiffs, <br><br> v. <br><br> BOYNE USA, INC.; BOYNE PROPERTIES, INC.; and SUMMIT HOTEL, LLC, <br><br> Defendants. | **No. CV 21-95-BU-BMM** <br><br><br> **ORDER** |

### INTRODUCTION

Defendants Boyne USA, Inc., Boyne Properties, Inc., and Summit Hotel, LLC (collectively "Boyne") have filed a motion for partial summary judgment on Count VI (Unfair trade practices) and Count VII ((Declaratory Judgement) of Plaintiffs' complaint. (Doc. 188 at 8.) Plaintiffs oppose the motion. (Doc. 197 at 14.) The Court held a hearing on the motion on February 1, 2024. (Doc. 208.)

1

## BACKGROUND

Boyne owns and operates Big Sky Resort ("Big Sky"), as well as three condominium-hotels at the base of Big Sky known as the Summit, Shoshone, and Village Center (collectively "the Condos"). (Doc. 26 at 2, 5.) Boyne runs the "condo hotels" as a traditional hotel, offering many amenities to guests including front desk service, bellman service, security, housekeeping, and access to pools, laundry, hot tubs, and a fitness center. (Doc. 188 at 21.) Boyne employs 283 full-time employees for lodging operations and 14 employees for marketing the rental of the condo hotel units. (Doc. 187-7 at 3–4.) Title to the condo units is subject to recorded Declarations. (Doc. 4 at 8.) Boyne drafted the Declarations and does not allow amendments without its consent. (Doc. 1-1 at 18–19.) The Declarations prohibit renting of the units unless rented through Boyne or an agent designated by Boyne.

Boyne contends that the exclusive leasing arrangement proves essential to maintaining a high quality, hotel-like guest experience. Boyne notes that third-party management presents a variety of issues including guests being unaware that the Boyne-provided amenities are unavailable to them and two instances of security breaches. (Doc. 188 at 23–24.) Boyne further notes that numerous other properties exist in the Big Sky area that do not require purchasers to use Boyne as their exclusive rental management company. (*Id.* at 25–26.)

Erharts own two units in the Summit. They purchased the first unit in 2005 from Summit Properties. (Doc. 198 at 17.) They purchased the second unit in 2006 from owners Craig and Rhonda Coles. (*Id.* at 20.) Erharts entered an RMA with Boyne five days after the purchase of their first unit and entered another RMA in December of 2006 for the rental of their second unit. (*Id.* at 19, 21.)

Andersons own a unit in the Shoshone. (*Id.*) They purchased the unit from then-owner James Holmes in 2011. (*Id.*) Andersons entered an RMA with Boyne approximately two weeks later. (*Id.*)

Clagett owns a unit in the Village Center. He purchased the unit from Boyne Properties, Inc. in May of 2014. (*Id.* at 23–24.) Clagett and his wife are licensed real estate agents in Montana, and Clagett's wife used to be a real estate agent for the Trump Corporation in New York. (*Id.* at 24.) The Village Center affords Clagett the option to rent the unit by himself if renting for a term of at least six months. (*Id.* at 25–26.) Clagett entered an RMA approximately one month after his purchase of their unit. (*Id.* at 26.) Clagett also signed an owner participation program rider. (*Id.*) The rider affords a 10% reduction in Boyne's management fee in exchange for the owner of the unit personally participating in some aspects of the renting of their unit. (*Id.*)

3

**STANDARD OF REVIEW**

Summary judgment proves appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine material fact dispute requires sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248.

Summary judgment "'should be used sparingly in complex antitrust litigation where motive and intent play leading roles.'" *Taggart v. Rutledge*, 657 F. Supp. 1420, 1432 (D. Mont. 1987) (quoting *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473 (1962)). Summary judgment remains appropriate, however, when no "'significant probative evidence tending to support the complaint'" exists. *Taggart*, 657 F. Supp. at 1432 (quoting *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Systems, Inc.*, 732 F.2d 1403, 1406 (9th Cir. 1984)).

**DISCUSSION**

Boyne seeks summary judgment on Plaintiffs' claims for violation of unfair trade practices and for declaratory judgment. Boyne notes that Plaintiffs plead an alleged illegal "tying arrangement" to support these claims. Boyne contends that Plaintiffs have failed to demonstrate an illegal tying arrangement and that Boyne

4

should be entitled to summary judgment on the unfair trade practices and declaratory judgment claims.

Plaintiffs argue that the Court should delay ruling on this matter until class notice procedures have been completed. Plaintiffs further argue that the sale of the condos with declarations requiring Plaintiffs to use Boyne as a rental manager constitutes an illegal "tying arrangement" that supports their unfair trade practices claim. Plaintiffs contend that their declaratory judgment claim rests on allegations that the declarations prove illegal and unenforceable. Plaintiffs argue that violations of securities law and unconscionability render the declarations unenforceable and entitle Plaintiffs to judgment as a matter of law on the declaratory judgment issue.

## I.     Whether the Court should delay adjudication of the motion for summary judgment on the grounds that class notification and opt-out has not yet occurred.

Plaintiffs argue that ruling on Boyne's summary judgment motion before class notice and opt-out potentially would violate the one-way intervention rule. (Doc. 197 at 25–26.) Boyne counters that the one-way intervention rule serves to protect defendants and can be waived by defendants. (Doc. 203 at 3.) Plaintiffs admit that the one-way intervention rule primarily serves to protect defendants and ordinarily can be waived by them. (Doc. 197 at 24.) Plaintiffs present concerns, however, that the Court's decision on summary judgment could extend beyond Boyne's waiver and result in decertification of the class.

5

"[D]istrict courts generally do not grant summary judgment on the merits of a class action until the class has been properly certified and notified." *Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995). Otherwise, the defendant risks one way intervention. *Id.* One way intervention occurs where a prospective class member waits to intervene until after adjudication on the merits, thereby collecting damages if the class wins but not being bound by collateral estoppel if the class loses. *Utah v. American Pipe & Constr. Co.*, 473 F.2d 580, 583 n.7 (9th Cir. 1973).

The notice and opt-out procedures serve to protect the defendant. *Poe v. Nw. Mut. Life Ins. Co.*, 8:21-cv-02065-SPG-E, 2023 U.S. Dist. LEXIS 127923, at \*5 (C.D. Cal. July 11, 2023); *see Schwarzschild*, 69 F.3d at 295. Courts have recognized that a defendant who moves for early adjudication of the merits waives the protections against one-way intervention. *Rivera v. Ryder Integrated Logistics*, 2022 U.S. Dist. LEXIS 232104, at \*12–13 (C.D. Cal. Dec. 27, 2022) (citing *Wright v. Schock*, 742 F.2d 541, 544 (9th Cir. 1984); *Roberts v. Am. Airlines, Inc.*, 526 F.2d 757, 762–63 (7th Cir. 1975)). "[W]hen a defendant prefers to 'take its chances on stare decisis rather than res judicata,' the district court may grant the defendant's motion for summary judgment even though the class has not yet been notified." *Schwarzschild*, 69 F.3d at 297 (quoting *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 759 (3d Cir. 1974)).

Plaintiffs present concerns that Boyne has challenged only the Plaintiffs' "tying arrangement" theory of liability. Plaintiffs argue that if the Court grants summary judgment to Plaintiffs on other grounds, like unconscionability or violations of securities law, that decision would only bind the named plaintiffs, resulting in decertification of the class. Boyne may have addressed only the tying theory of liability in its initial brief in support, but Boyne addressed the other theories in its reply. Boyne has waived the protections against one-way intervention by filing its early motion for summary judgment. The Court will rule on the motion despite class notification and opt-out procedures not yet having occurred.

## II. Whether Plaintiffs' failure to specifically plead securities law violations and unconscionability under Claim VII of the Complaint precludes the Court from considering those theories

Boyne's motion for summary judgment treated the unfair trade practices claim and declaratory judgment claim as essentially one and the same. (Doc. 188 at 8.) Plaintiffs challenged this interpretation on the basis that the declaratory judgment claim relates to alleged violations of securities law and unconscionability. (Doc. 197 at 13.) Boyne argues that Plaintiffs may not rely on these theories to avoid summary judgment because the Plaintiffs failed to specifically plead these theories in support of the declaratory judgment claim in their complaint. (Doc. 203 at 5.)

"A party need not plead specific legal theories in the complaint, so long as the other side receives notice as to what is at issue in the case." *Segana v. Tenorio*, 384

7

F.3d 731, 736–37 (9th Cir. 2004) (internal quotations omitted). Where a complaint fails to "include the necessary factual allegations to state a claim," however, "raising such claim in a summary judgment motion is insufficient to present the claim to the district court." *Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008).

Plaintiffs pleaded sufficient allegations to put Boyne on notice of potential securities law violations. Plaintiffs did not identify specifically the securities law violation as grounds for finding the declarations illegal and unenforceable. Plaintiffs set forth, however, several factual allegations pertaining to the alleged securities law violations in their complaint (Doc. 26, ¶¶ 31–33) and other filings. (Doc. 9 at 27–29.) Plaintiffs set forth these allegations in the context of their fiduciary duty argument, but the allegations provide sufficient notice to Boyne of Plaintiffs' contention that the condo units represented illegal securities.

The Ninth Circuit has found sufficient notice where the claimant erroneously pleaded a violation of Title VII when a dentistry board refused to grant him a license. *Haddock v. Board of Dental Examiners*, 777 F.2d 462, 463–65. The Ninth Circuit recognized that the claim was non-cognizable under Title VII but that the facts supported a § 1983 claim for violation of the man's Fourteenth Amendment rights. *Id.* at 464. The claimant "[did] not refer to 42 U.S.C. § 1983 in his complaint, and mention[ed] the Fourteenth Amendment only briefly." *Id.* The Ninth Circuit noted,

8

however, that "a complaint should not be dismissed if it states a claim under any legal theory, even if the plaintiff erroneously relies on a different legal theory." *Id.* (citing *United States v. Howell*, 318 F.2d 162, 166 (9th Cir. 1963)).

Plaintiffs' declaratory judgment claim contended that the declarations proved unenforceable and illegal. (Doc. 26, ¶ 143.) The claim incorporated all prior paragraphs, some of which explicitly called out alleged violations of securities laws. (Doc. 26, ¶¶ 31–33, 140.) Plaintiffs put Boyne on sufficient notice that the alleged securities law violations could support the declaratory judgment action.

Plaintiffs failed to mention unconscionability in the complaint or in their early filings. Boyne recognized and acknowledged at the Ninth Circuit, however, that Plaintiffs had made claims pertaining to unconscionability. Plaintiffs' complaint and other filings consistently framed Boyne as exerting undue influence and unfair power over the declarations and rental management structure. This disclosure, coupled with Boyne's own acknowledgement that they understood Plaintiffs to be asserting claims related to unconscionability, proves sufficient for Plaintiffs to rely on unconscionability as grounds for their declaratory judgment claim.

### III. Whether an illegal "tying arrangement" exists to support Plaintiffs' unfair trade practices claim

A tying arrangement exists where one party agrees to sell one product to another party "but only on the condition that the buyer also purchases a different (or

tied) product, or at least agrees that he will not purchase that product from any other supplier." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 995 (9th Cir. 2023) (internal quotations omitted). Tying arrangements prove illegal "where a seller 'exploits,' 'controls,' 'forces,' or 'coerces' a buyer of a tying product into purchasing a tied-product." *Rick-Mik Enters. v. Equilon Enters., LLC*, 532 F.3d 963, 971 (9th Cir. 2008) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)).

### A. Whether the sale of the condominiums constituted a per se unlawful tying arrangement

A claimant must prove the following to show a per se unlawful tying arrangement:

> (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied-product; and (3) that the tying arrangement affects a "not insubstantial volume of commerce" in the tied-product market.

*Rick-Mik Enters.*, 532 F.3d at 971 (internal quotations omitted). The claimant fails to demonstrate a per se unlawful tying arrangement if the claimant fails to show any one of these elements.

### 1. Whether the sale of the condominiums constituted the tying of distinct products

Boyne argues that Plaintiffs have failed to demonstrate that the sale of the condominiums involved the tying of two products. Boyne argues that the condominium and rental package constitutes one integrated product rather than two

10

distinct, tied products. Boyne notes that the functionality of the condo hotels depends on having one rental manager to provide a seamless, cohesive experience for guests. Boyne contends that the rental management services represent an essential element of Boyne's business plan for its singular product—condominium units that can be rented out as if part of a hotel.

Whether products constitute separate products "'turns not on the functional relation between them, but rather on the character of the demand for the two items.'" *Epic Games, Inc.*, 67 F.4th at 995 (quoting *Jefferson Parish*, 466 U.S. at 19, n.30). Courts looks to several factors to determine whether products prove separate and distinct. "These include consumer requests to offer the products separately, disentangling of the products by competitors, analogous practices in related markets, and the defendant's historical practice." *Id.*

Condo ownership and rental management services constitute separate products. Plaintiffs have demonstrated that other competitors disentangle those products both within and outside Big Sky. (Doc. 197 at 45–46.) Boyne's own evidence shows that condo ownership and rental management services remain distinct at other locations throughout Big Sky. (Doc. 187-7 at 4–5.) Boyne identified twelve similar properties in the Big Sky region where condominium ownership and rental management remain distinct, separate products. (*Id.*) Boyne itself also offers rental management services as a separate, standalone service outside the

11

condominium hotels. Plaintiffs successfully have raised a genuine issue of material fact as to whether Boyne tied two distinct products—rental management and condominium ownership—with the Declarations.

### 2.  Market power

Plaintiffs still must satisfy the element of market power to survive summary judgment. "[T]o state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.'" *Newcal Indus. V. Ikon Officer Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008). The scope of the relevant market generally represents a factual dispute to be resolved by a jury. *Id*. at 1045. Failure to allege power in the relevant market or failure to present evidence to support the alleged relevant market prove sufficient, however, to warrant dismissal of an illegal tying claim. *Id*. at 1051; *Rick-Mik Enters.*, 532 F.3d at 972. A plaintiff's failure "to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand" or proposal of a "relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor" renders the plaintiff's claim legally insufficient. *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997).

An appropriately defined relevant market "encompasses notions of geography as well as product use, quality, and description." *Oltz v. Saint Peter's Community*

*Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988). "The geographic market extends to the 'area of effective competition . . . where buyers can turn for alternate sources of supply.'" *Id.* (quoting *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1218 (9th Cir. 1977)). The product market extends to "goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Oltz*, 861 F.2d at 1446. Cross-elasticity "is the responsiveness of the sales of one product to price changes of the other." *United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 400 (1956). "[I]nterchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the competing commodities." *Id.* at 380.

The parties dispute the relevant market. Boyne contends that the relevant market consists of vacation properties near ski resorts in North America. (Doc. 188 at 40–41.) Plaintiffs define the relevant market as "slopeside condominiums at Big Sky Resort." (Doc. 197 at 48.) Plaintiffs failed to provide any analysis of interchangeability and cross-elasticity to justify this proposed market. Plaintiffs instead argue that the condominium units represent "unique products." Plaintiffs cite Boyne's founder's statement that Boyne developed the condominiums because "there weren't enough places to stay." (*Id.*)

The Second Circuit addressed a nearly identical issue in *Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*, 414 Fed. App'x 372 (2d Cir.

2011). The Second Circuit rejected the market proposed by the homeowners' association, which consisted of "vacation properties in 'the immediate vicinity' of the Village at Smugglers' Notch." *Id.* at 375. The homeowners' association, like Plaintiffs here, argued that the unique nature of the vacation properties supported such a narrow market definition. *Id.* The Second Circuit noted that "there are undoubtedly many other vacation properties located within or in close proximity to ski areas." *Id.* at 376. The Second Circuit further noted that many of the property owners resided out of state, further negating the contention that other ski resorts could not serve as substitute locations for the homeowners' vacation properties. (*Id.*)

A Florida district court addressed in *Q Club Resort & Residences Condo. Ass'n v. Q Club Hotel, LLC*, 2010 U.S. Dist. LEXIS 147051 (S.D. Fla. Jan. 5, 2010), an almost identical claim as that brought by Plaintiffs. The claimants in *Q Club* sued a condominium hotel operator where declarations in the purchase agreements required condominium owners to use the hotel operator as their rental manager. *Id.* at *1–2. The district court rejected the owners' illegal tying claim because the owners' provided a legally inadequate definition of the relevant market. *Id.* at *5. The owners argued that the relevant geographic market was Fort Lauderdale beach because the owners sought a more family friendly beach environment than that of other South Florida beaches. *Id.* at *7. The district court determined that the "narrow definition of the geographic market to include only a single beach in South Florida

14

is unreasonable and does not correspond to the realities of the real estate industry when there exist numerous other beach locations where consumers can practically seek alternative sources of the product." *Id.* (internal quotations omitted).

A multitude of ski resorts exist across the United States that offer condominium ownership with a choice of rental managers. Vail and Intrawest represent two examples. (Doc. 197 at 46.) Like the owners in *Smugglers' Notch Homeowners' Ass'n*, Plaintiffs have failed to demonstrate any local connection that warrants limiting the geographic location of the market to Big Sky. Plaintiffs reside in Florida and New York. Plaintiffs' deposition statements indicate the substitutability of any other upscale ski resort for Big Sky. Plaintiff Clagett stated in deposition that his expectation was that Big Sky would develop into a resort like Vail and Aspen. (Doc. 187-10 at 9.) Plaintiff Erhart stated in deposition that they decided to buy the condo in Big Sky because they liked "the idea of having a condo accessible to be able to ski." (Doc. 187-17 at 3.) Plaintiffs have presented a narrow and legally deficient definition of the relevant market to establish their illegal tying claim.

Even if the Court accepted Plaintiffs' exceptionally narrow definition of the relevant market, Plaintiffs have failed to demonstrate market power. At least 16 other companies offer rental management services in Big Sky. (Doc. 187-7 at 5–6.) At least 12 other property complexes in Big Sky allow owners to use rental management

15

services outside Boyne, and 10 of those property complexes constitute "slope side" properties. (*Id.* at 4–5.) Boyne correctly notes that hundreds, if not thousands, of other properties also exist outside the resort to which Boyne does not offer its rental management services. Plaintiffs could have purchased any of these other properties if they wanted to avoid having to use Boyne as their rental manager.

Plaintiffs do not contest these facts. Plaintiffs instead argue that the tying of rental management services and condominium ownership demonstrate Boyne's market power. (Doc. 197 at 49.) "[T]he law prohibits an antitrust claimant from resting on market power that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant." *Newcal Indus.*, 513 F.3d at 1048. The Ninth Circuit in *Newcal Indus.* relied on the Third Circuit's decision in *Queen City Pizza* relating to market power. *Id.* at 1046–47.

The Third Circuit in *Queen City Pizza* addressed illegal tying claims made by franchisees of Domino's Pizza. 124 F.3d at 434. The franchisees argued that the franchise agreement's requirement that franchisees purchase all ingredients from Domino's Pizza constituted an illegal tying arrangement. *Id.* at 442. The Third Circuit noted that pizza ingredients are reasonably interchangeable. *Id.* at 443. The only thing that prevented the franchisees from obtaining pizza ingredients from other suppliers was the contract that the franchisees willingly signed. *Id.* "[W]here the defendant's 'power' to 'force' plaintiffs to purchase the alleged tying product stems

16

not from the market, but from plaintiffs' contractual agreement to purchase the tying product, no claim will lie." *Id.*

Plaintiffs do not dispute that many other property management services remain available in the Big Sky area. (Doc. 198, ¶ 126.) Plaintiffs do not dispute that other properties exist in the Big Sky area that do not require owners to use Boyne as a rental manager. (*Id.*, ¶ 124.) Plaintiffs have failed to offer any evidence of market power even in the overly narrow "market" that Plaintiffs identify. Plaintiffs provide no statistics as to the proportion of slope side properties owned by Boyne or the availability of condominiums in Big Sky at the time of Plaintiffs' respective purchases. Plaintiffs provide no information about the proportion of the rental management industry that Boyne occupies in Big Sky or elsewhere.

Plaintiffs only argue that Boyne has market power in rental management services because the covenants governing their properties, of which they had notice of at the time of purchase, require them to use Boyne as a rental manager. Boyne's "'power' to 'force' [P]laintiffs to purchase the alleged tying product stems not from the market, but from [P]laintiffs' contractual agreement to purchase the tying product." *Queen City Pizza*, 124 F.3d at 443. Plaintiffs cannot rest their claim "on market power that arises solely from contractual rights that [Plaintiffs] knowingly and voluntarily gave to the defendant." *Newcal Indus.*, 513 F.3d at 1048. Plaintiffs' claim regarding an illegal tying arrangement fails both due to Plaintiffs' legally

17

deficient characterization of the "market" and Plaintiffs' failure to provide any evidence of market power outside of the voluntary contracts signed by Plaintiffs that gave Boyne that power.

### 3. Whether the alleged tying arrangement affects a not insubstantial volume of commerce in the tied product market

Plaintiffs have failed to appropriately define the relevant market and have failed to demonstrate market power. The Court grants summary judgment on these bases. The Court also notes, however, that Plaintiffs' illegal tying arrangement claim also requires Plaintiffs to demonstrate that the tying arrangement affects a "not insubstantial volume of commerce" in the rental management market. Plaintiffs' claim also would fail on this basis.

Plaintiffs' only support for their assertion that the tying arrangement affects a substantial volume of commerce in the market is that Boyne earns millions annually from the renting of condo units. Plaintiffs note that Boyne earned $7.5 million from renting units in the Condo Hotels in 2022 and nearly $10 million the next year. (Doc. 197 at 49–50.) Plaintiffs fail to provide any reference for these numbers in the context of the rental management industry. The Court lacks knowledge of whether $7.5 million represents 20% of the relevant rental market or 90% of the relevant rental market. Plaintiff at most has shown that Boyne's tying arrangement affects three condominium hotels in the Big Sky area. Plaintiff has failed to present any

information about the proportion of rentable units that these hotels comprise of all slope side rentable units in the Big Sky area. Even if the Court accepted Plaintiffs' overly narrow definition of the "relevant market," Plaintiffs fail to raise genuine questions about Boyne's market power or the volume of commerce affected by the tying arrangement. Accordingly, Plaintiffs' claim of an illegal tying arrangement proves legally deficient. The Court grants judgment as a matter of law to Boyne on this claim.

### B. Whether the sale of the condominiums constituted an unlawful tying arrangement under the rule of reason

"A tying arrangement which is not unlawful per se 'may be invalidated under the 'rule of reason' if the party challenging the tie demonstrates that it is 'an unreasonable restraint on competition in the relevant market.'" *County of Tuolumne v. Sonora Community Hosp.*, 236 F.3d 1148, 1157 (9th Cir. 2001) (quoting *Beard v. Parkview Hosp.*, 912 F.2d 138, 140 (6th Cir. 1990)). A rule of reason challenge requires the factfinder to "analyze the anti-competitive effects along with any pro-competitive effects to determine whether the [arrangement] is unreasonable on balance." *Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991).

"Under the rule of reason burden-shifting scheme, plaintiffs first must 'delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly.'" *County of Tuolumne*, 236 F.3d at

1159 (quoting *Bhan*, 929 F.2d at 1413). The burden then shifts to the defendants to demonstrate that the challenged behavior serves a legitimate objective. *County of Tuolumne*, 236 F.3d at 1159. If the defendants meet this burden, the burden "shifts back to plaintiffs to demonstrate that there were less restrictive alternatives." *Id.*

Plaintiffs' failure to present an adequate definition of the relevant market to establish their illegal tying claim proves fatal to Plaintiffs' claim under the rule of reason. Plaintiffs have alleged "a proposed relevant market that clearly does not encompass all interchangeable substitute products." *Smugglers' Notch Homeowners' Ass'n*, 414 Fed. App'x at 375. Plaintiffs' proposed market proves "legally insufficient." *Id.* Plaintiffs' claim of illegal tying under the rule of reason fails.

4. **Whether the Declarations should be declared unenforceable due to violations of securities law or unconscionability**

Boyne emphasizes that the Plaintiffs entered purchase agreements knowingly and voluntarily, fully aware of the existence of the restrictive covenants that governed the property. Boyne argues that these covenants represent contractual agreements entered by the parties with record notice that prove valid because "they tend to maintain or enhance the character" of the property and are "used in connection with some general plan or scheme." *Town & Country Estates Ass'n v. Slater*, 740 P.2d 668, 671 (Mont. 1987). Plaintiffs contend that the declarations

20

prove unconscionable and the sale of the condos with those declarations violated

securities law.

### a. Violations of Securities Law

The Securities and Exchange Commission ("SEC") has struggled to outline

when the sale of condominiums constitutes a security. A 1973 guidance issued by

the SEC provided the following information:

> condominium units may be offered with a contract or agreement that
> places restrictions, such as required use of an exclusive rental agent . .
> . on the purchaser's occupancy or rental of the property purchased. Such
> restrictions suggest that the purchaser is in fact investing in a business
> enterprise, the return from which will be substantially dependent on the
> success of the managerial efforts of other persons. In such cases,
> registration of the resulting investment contract would be required.
> . . .
> condominiums, coupled with a rental arrangement, will be deemed to
> be securities if they are offered and sold through advertising, sales
> literature, promotional schemes or oral representations which
> emphasize the economic benefits to the purchaser to be derived from
> the managerial efforts of the promoter, or a third party designated or
> arranged for by the promoter, in renting the units.

1973 SEC LEXIS 3277, at *5–7. Under federal caselaw, a security exists where the

following conditions apply: "(1) an investment of money (2) in a common enterprise

(3) with an expectation of profits produced by the efforts of others." *Warfield v.*

*Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009) (quoting *SEC v. Rubera*, 350 F.3d 1084,

1090 (9th Cir. 2003)). Montana law sets forth a similar test: "1) an investment; 2) in

a common venture; 3) with reasonable expectation of profits; 4) derived through the

entrepreneurial or managerial efforts of others." *Redding v. Montana First Judicial*

*Dist. Court*, 281 P.3d 189, 191 (Mont. 2012) (citing *State v. Duncan*, 593 P.2d 1026, 1032 (Mont. 1979)).

"The 'investment of money' prong of the *Howey* test 'requires that the investor commit his assets to the enterprise in such a manner as to subject himself to financial loss.'" *Warfield*, 569 F.3d at 1021 (quoting *Rubera*, 350 F.3d at 1090 (internal quotations omitted)). "[C]ourts conduct an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were "led to expect.'" *Warfield*, 569 F.3d at 1021 (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946)). "[T]he promotional materials associated with an instrument or transaction" prove an important factor in ascertaining what the purchasers expected. *Warfield*, 569 F.3d at 1021.

Plaintiffs have presented evidence of promotional materials that refer to "economic tax benefits" and receipt of information regarding Boyne's rental incomes. (Doc. 198-7 and Doc. 198-9.) Boyne's owner also implied in his deposition that the parties knew of the terms of the rental management agreement when they signed the purchase contract. (Doc. 198-39 at 4.) This admission undermines Boyne's claim that the RMAs were discussed and negotiated only after the purchase. Plaintiffs have presented sufficient evidence to raise a genuine issue of material fact as to whether the sale of condominium units subject to the Declarations constitute

22

securities such that the Declarations prove unenforceable. The Court will deny summary judgment on this claim.

### b. Unconscionability

"[U]nconscionability is a two-element equitable doctrine rendering an otherwise validly formed contract or term unenforceable if (1) the contract or term is a contract of adhesion and (2) the contract or term unreasonably favors the stronger party or is unduly oppressive to the weaker party." *Lenz v. FSC Secs. Corp.*, 414 P.3d 1262, 1274 (Mont. 2018). "[E]lements which may be indicators of unconscionability include unequal bargaining power, lack of meaningful choice, oppression, and exploitation of the weaker party's vulnerability or lack of sophistication." *Kelly v. Widner*, 771 P.2d 142, 145 (Mont. 1989).

The Montana Supreme Court addressed whether covenants governing property constituted a contract of adhesion in *Graziano v. Stock Farm Homeowners' Ass'n*, 258 P.3d 999, 1001–03 (Mont. 2011). The Montana Supreme Court noted that the covenants ran with the land for the benefit of the landowners and that the claimant maintained the power to change the covenants through the amendment process. *Id.* at 1004. The Montana Supreme Court determined that the covenants in that case did not constitute contracts of adhesion that would render them unconscionable. *Id.* The Montana Supreme Court specifically noted, however, that

the case did "not foreclose the possibility that a future plaintiff could demonstrate that land use covenants, conditions, and restrictions are adhesive." *Id.*

A contract of adhesion exists where "a party in superior bargaining position dictates the contract terms to the weaker party on a take it or leave it basis without any reasonable opportunity for negotiation." *Lenz*, 414 P.3d at 1274. Disparity in bargaining power represents "an essential element of a contract of adhesion." *Junkermier, Clark, Campanella, Stevens, P.C. v. Alborn, Uithoven, Riekenberg, P.C.*, 380 P.3d 747, 756 (Mont. 2016) (internal quotations omitted); *see also Day v. CTA, Inc.*, 324 P.3d 1205, 1209 (Mont. 2014). Boyne drafted the Declarations requiring condominium owners to use Boyne as their rental manager should the owners choose to rent their units. (Doc. 198-13 at 3–5.) Boyne also drafted the RMAs. (*Id.* at 5–6.) Plaintiffs had "little or no choice" about the terms of the Declarations or the RMAs at the time they purchased the condominium units. *Day*, 324 P.3d at 1209.

Plaintiffs also have presented evidence that Boyne "structured the Condo-Hotels and planned the unit sales to maintain permanent control over the owners' associations." (Doc. 197 at 40.) For example, the Shoshone Bylaws give Boyne the right to designate a majority of the board positions for the condominium association. (Doc. 198-10 at 5.) The Court must construe evidence in the light most favorable to Plaintiffs at this stage. Plaintiffs' evidence supports an inference that unlike the

claimant in *Graziano*, Plaintiffs lack power to change the terms of the Declarations. Plaintiffs also lack the ability to change the terms of the RMAs.

The Declarations require Plaintiffs to use Boyne as their rental manager if renting their unit. Plaintiffs' must accept whatever RMA Boyne provides in order to rent their units. Plaintiffs "would have been excluded from the [rental management] market if [they] did not accept the agreement." *Zigrang v. U.S. Bancorp. Piper Jaffray, Inc.*, 123 P.3d 237, 240–41 (Mont. 2005). The Court acknowledges Boyne's argument that Plaintiffs, as former doctors, investment bankers, and real estate agents, represent relatively sophisticated consumers. The Court finds, however, that disputes about bargaining power under these circumstances proves more appropriately resolved by a jury. Plaintiffs have raised a genuine issue of material fact as to the bargaining power of the parties and the ability to negotiate or subsequently change the terms of the Declarations or RMAs. The Court will deny Boyne's motion for summary judgment on this claim.

## CONCLUSION

Plaintiffs' claim regarding an illegal tying arrangement fails both due to Plaintiffs' legally deficient characterization of the "relevant market" and Plaintiffs' failure to provide any evidence of market power outside the voluntary contracts signed by Plaintiffs that gave Boyne that power. The Court will grant Boyne's motion for summary judgment on Plaintiffs' Unfair Trade Practices / Antitrust claim

(Count VI). Genuine issues of material fact exist as to Plaintiffs' allegations that the Declarations and RMAs prove illegal and unenforceable. The Court declines to grant summary judgment to Boyne on Plaintiffs' claim for declaratory judgment (Count VII).

## ORDER

Accordingly, **IT IS ORDERED** Boyne's Motion for Partial Summary Judgment is **GRANTED** (Doc. 186), in part, and **DENIED**, in part, as follows:

1. Boyne's Motion for Partial Summary Judgment (Doc. 186) is **GRANTED** as to Plaintiffs' claim for Unfair Trade Practices/Antitrust Violations. Plaintiffs' claim for Unfair Trade Practices/Antitrust Violations (Count VI) is hereby **DISMISSED** with prejudice.

2. Boyne's Motion for Partial Summary Judgment (Doc. 186) is **DENIED** as to Plaintiffs' claim for Declaratory Judgment (Count VII).

DATED this 5th day of April, 2024.

_____
Brian Morris, Chief District Judge
United States District Court

26